**THOMAS P. SMITH JR.**
**CO-ACTING REGIONAL DIRECTOR**
**Richard Hong**
**Alix Biel**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004-2616**
**212-336-0956 (Hong)**
**Email: HongR@sec.gov**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>          **-against-**<br><br>**NATIONAL REALTY INVESTMENT ADVISORS LLC, REY E. GRABATO II, DANIEL COLEY O'BRIEN, THOMAS NICHOLAS SALZANO and ARTHUR S. SCUTARO, a/k/a ARTHUR S. SCUTTARO,**<br><br>                         **Defendants,**<br><br>          **and**<br><br>  **OLENA BUDINSKA, and**<br>  **JAMIE A. SAMUL, a/k/a JAMIE SALZANO,**<br><br>                    **Relief Defendants.** | **COMPLAINT**<br><br>**22 Civ. _____ (    )**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), 100 Pearl Street, Suite 20-100, New York, New York 10004, alleges as follows for its Complaint against the following Defendants and Relief Defendants, whose names and last known addresses are set forth below:

a.  Defendant National Realty Investment Advisors LLC ("NRIA"), 1 Harmon Plaza, Floor 9, Secaucus, New Jersey 07094;

b.   Defendant Rey E. Grabato II ("Grabato"), 1110 Clinton Street, Apartment 6, Hoboken, New Jersey 07030;

c.   Defendant Daniel Coley O'Brien ("O'Brien"), 513 Montauk Highway, Southampton, New York 11968;

d.   Defendant Thomas Nicholas Salzano ("Salzano"), 82 Osprey Court, Secaucus, New Jersey 07094;

e.   Defendant Arthur S. Scutaro, a/k/a Arthur S. Scuttaro ("Scutaro"), 102 Sadler Road, Bloomfield, New Jersey 07003;

f.   Relief Defendant Olena Budinska ("Budinska"), 123 Town Square Place, Apartment 645, Jersey City, New Jersey 07310; and

g.   Relief Defendant Jamie A. Samul, a/k/a Jamie Salzano ("Samul"), 39 Fullerton Avenue, Apartment C12, Montclair, New Jersey 07042.

## SUMMARY OF ALLEGATIONS

1.      The Defendants knowingly or recklessly engaged in a Ponzi-like scheme involving NRIA, a New Jersey-based real estate development firm that solicited investments via nationwide radio and television advertisements, and which filed for Chapter 11 bankruptcy protection on June 7, 2022.

2.      Since 2018, NRIA purported to manage an investment fund that owned a portfolio of properties in New York, New Jersey, Pennsylvania and Florida called the NRIA Partners Portfolio Fund I LLC ("the Fund"), and which also filed for Chapter 11 bankruptcy protection on June 7, 2022.

3.      From inception through January 2022, Grabato, O'Brien, Salzano, Scutaro and NRIA, engaged in a fraudulent scheme, including making and disseminating material

2

misrepresentations, and raised more than $600 million for the Fund from approximately 2,000 investors, including many in New Jersey.  Among the investors were 382 retirees who contributed more than $94.8 million from retirement accounts.

4.      Contrary to what was disclosed to investors from inception through at least June 2021, neither NRIA nor the Fund generated enough cash from operations to cover the distributions made to investors.

5.      NRIA manipulated the Fund's financial statements and the financial information in marketing material distributed to investors, intentionally disguising the misuse of investor funds and creating the false appearance that NRIA and the Fund were generating more revenue than they actually were and that operations were successful.  In reality, NRIA had little to no revenue and the operation was run largely with investor funds.

6.      In addition, throughout the history of the Fund, the Defendants used investor funds to pay investor distributions, to fund Salzano's family's personal and luxury expenses through his current and former spouses, the Relief Defendants, and to pay reputation management firms to thwart investors' due diligence of NRIA's executives.

## VIOLATIONS

7.      By virtue of the foregoing conduct and as alleged further herein, the Defendants have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.      Unless the Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

10.     The Commission seeks a final judgment: (a) permanently restraining and enjoining the Defendants from violating the federal securities laws this Complaint alleges they have violated; (b) ordering the Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (c) ordering the Defendants and Relief Defendants to disgorge or return ill-gotten gains or unjust enrichment and pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), (5) and (7) [15 U.S.C. §§ 78u(d)(3), (5) and (7)]; and (d) permanently prohibiting Grabato, O'Brien, Salzano and Scutaro from serving as officers or directors of any company that has a class of securities registered under Section 12 of Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)].

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

12.     The Defendants and Relief Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)]

and Exchange Act Section 27 [15 U.S.C. § 78aa].  The Defendants and Relief Defendants may be found in, reside in, or transact business in the District of New Jersey, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including solicitation of investors who resided in New Jersey.

## DEFENDANTS AND RELIEF DEFENDANTS

### Defendants

14.    **NRIA** is a real estate investment, management and development firm that claims to have developed dozens of multi-family residential properties since 2006 in New York, New Jersey, Pennsylvania and Florida.  It is organized as a New Jersey limited liability company. Based in Secaucus, New Jersey, it advertised nationwide on radio and television, and had billboards in New Jersey.  NRIA claimed to have $1.25 billion under management as of 2021.  It filed for Chapter 11 bankruptcy protection on June 7, 2022.

15.    **Grabato**, 43, of Hoboken, New Jersey, was the majority owner (eighty percent), president and chief executive officer of NRIA, which he founded in 2006 after working for nearly a decade processing loans for residential, commercial and construction projects.  He started NRIA to build and renovate residential properties in the Philadelphia area and expanded into New Jersey, New York and Florida. Grabato resigned from NRIA in April 2022. Grabato received at least $4.2 million in investor funds into his personal and LLC accounts.

16.    **O'Brien**, age 41, of Southampton, New York, was a minority owner (twenty percent) of NRIA and in charge of managing its portfolio of commercial mortgage-backed securities. He wholly owns NRIA Capital Partners, Inc., a New York corporation, and 44 Capital Management Corp., a New Jersey corporation. As of March 2022, O'Brien had been terminated from NRIA and is no longer an owner of NRIA. O'Brien received approximately $6.7 million in

investor funds through the entities he owned.

17.     **Salzano**, 62, of Secaucus, New Jersey, until his arrest March 4, 2021 in connection with *United States v. Salzano*, Mag. No. 21-13062 (D.N.J.), was a vice president at NRIA.  He resigned from NRIA in October 2021.  Aside from the foregoing criminal action and its related SEC action in *SEC v. Salzano*, 21-cv-12189 (D.N.J.), Salzano's history of other fraudulent conduct, discussed more fully below – and affirmatively hidden from NRIA investors – includes civil settlements with the Federal Trade Commission and a criminal conviction in Louisiana, where he pled guilty to theft in connection with defrauding consumers as part of a nationwide telecommunications scam involving his former enterprise, NorVergence, Inc. Salzano received at least $640,000 in investor funds directly and indirectly through his wife, Budinska.

18.     **Scutaro**, age 62, of Bloomfield, New Jersey, was an executive vice president and head of NRIA's sales team until approximately May 2022. Previously, he had been involved in the same fraud as Salzano at NorVergence, Inc., although at the time he spelled his name "Scuttaro."

### Relief Defendants

19.     **Budinska**, age 32, of Secaucus, New Jersey, has been married to Salzano since 2017.  She did no work for NRIA in any capacity.  Grabato sent her nearly $300,000 directly and indirectly from bank accounts into which investor funds had been deposited, which she used for personal, luxury purchases and to route funds to Salzano. She received nearly $1.2 million more directly from NRIA and its affiliated entities, for a total of nearly $1.5 million of investor funds. As described below, the funds Budinska obtained constitute ill-gotten gains because she does not have a legitimate claim to them.

20.     **Samul**, age 63, of Montclair, New Jersey, previously was married to Salzano. She did no work for NRIA in any capacity.  Grabato sent her more than $260,000 from his LLC account into which investor funds had been transferred.  As described below, the funds Samul obtained constitute ill-gotten gains because she does not have a legitimate claim to them.

## FACTS

### Background

21.     The Fund was organized in February 2018 as a Delaware limited liability company. According to the offering documents, the Fund was organized to acquire equity interests in limited liability companies and to serve as the authorized manager and 100 percent equity owner of the underlying operating companies, which themselves would invest directly in real estate assets.

22.     According to the offering documents, NRIA managed the Fund and purported to act as the developer of the real estate assets.  In exchange for these services, NRIA was entitled to its *pro rata* share of any distributions of profits and a fee of up to three percent of the purchase price of each property for its project management and development.

23.     Prior to the Fund offering, NRIA was involved in developing various individual investment properties in New York, New Jersey, Pennsylvania and Florida. Investors rolled $80 million invested in these various individual properties into the Fund at its inception, receiving credits for millions of dollars of "bonuses" (although no cash payments) between 2019 and 2021.

24.     Investments in the Fund took the form of membership units that were described by the Fund's confidential Private Placement Memorandum ("PPM") and were to be offered only to accredited investors.

25.     The Fund, which closed to new investments in January 2022, initially planned to

sell up to 500 units at $50,000 each, for a total offering price of $25 million.  The September

2021 version of the PPM disclosed that the offering was expanded to $750 million. Planned

liquidation of assets was anticipated to begin in 2023.

26.     Between February 2018, when the Fund was created, and January 2022, when it

closed, approximately 2,000 investors (including 382 retirees) contributed more than $600

million to the Fund (including more than $94.8 million from retirement accounts).  Many of the

investors were residents of New Jersey.

27.     On June 7, 2022, NRIA and certain of its affiliates, including the Fund, filed for

Chapter 11 bankruptcy protection.

**Ponzi-Like Scheme**

Representations Concerning Distribution Payments

28.     The Fund's PPMs, which were amended five times through June 2021, disclosed

that the Fund intended to pay net annualized preferred returns of twelve percent to twenty one

percent depending on the number of membership units purchased.

29.     During the period of inception through June 14, 2021, the PPMs disclosed that

distributions were to come from the operating cash flow derived from investments made by the

underlying operating companies. In fact, many of the risk factors disclosed in the PPMs reflect

the potential risk to cash flows from operations which would, in turn, impact the cash available

for distribution to investors.

30.     The PPMs through June 2021 disclosed that it "is guaranteed by agreement with

NRIA" that returns will be at least twelve percent annualized and that NRIA will pay any

shortfall.

31.     The PPMs through June 2021 further disclosed that substantially all proceeds of the offering would be used for investment in one or more investment companies, as well as administrative and operating expenses, working capital requirements and other general corporate purposes.

32.     In June 2021, the use of proceeds disclosure was revised to allow NRIA to make distributions to investors using the proceeds of the offering.

The Source of the Fund's Distribution Payments

33.     Contrary to the PPM, the source of the Fund's distributions was not operating cash flow derived from investments made by the underlying operating companies, or otherwise from NRIA.  Rather, from inception through June 14, 2021, the Fund paid approximately $13.8 million of distributions and the majority of that was paid using investor funds.

34.     Initially, investor funds were deposited to an account in the Fund's name.  From its earliest days, the Fund used these investor contributions to cover distributions.

35.     For example, from March through June 19, 2018, the Fund received $904,407 in contributions from investors. During that same time period – when the Fund's bank account had no other deposits – $138,513 in distributions was paid out to investors.

36.     The graphic below illustrates that from March 2018 through November 3, 2020, a total of $5.5 million of investor funds was deposited to the Fund's account.  Those funds were used directly or transferred through other accounts and used to pay at least $600,000 in distributions in 2018 and 2019.  A majority of the remaining funds were transferred to NRIA's and its affiliated entities' accounts, including NRPM (National Realty Project Managers LLC),

and used to pay business expenses and cover additional distributions to investors.



37.     In fact, although not depicted on the graphic above in detail, after June 19, 2018,

the majority of investor funds was deposited directly to NRIA's accounts.  From there, new

investor funds were used either to pay existing investor distributions directly or moved to other

accounts to replenish accounts which paid existing investor distributions.

38.     To provide a few examples:

      a.      in May 2019, investor distributions caused the cash account on the general ledger to have a negative balance of approximately $29,000, which was brought positive with new investor contributions and a loan;

      b.      in October 2019, distributions again sent the cash account on the general ledger to have a negative balance of approximately $136,000, which was brought positive by two new investor deposits totaling $200,000;

      c.      in November 2019, distributions caused the cash account on the general ledger to have a negative balance of approximately $485,000, where it remained for a week until new investor deposits brought the account positive.

39.      From inception to June 14, 2021, the PPMs did not disclose that investor funds would be used to make distributions to other investors.  This omission concerning the use of investor funds was material.

40.      Many investors expressly told NRIA staff that they feared the Fund was a Ponzi scheme.  In fact, so many investors shared this concern that Salzano scripted a response for the sales team, claiming that a Ponzi scheme was defined by having no genuine business activity and NRIA, by contrast, had actual real estate projects. After hearing NRIA's response, investors who had raised these concerns proceeded to invest.

<u>The Fund's Income Was Insufficient to Pay Distributions</u>

41.      The Fund did not have audited financial statements, but it had financial statements compiled by a local New Jersey certified public accounting firm.

42.     As shown on the chart below, the financial statements reflect that for the period of inception through June 30, 2020, the Fund had no revenue and no net income, yet paid out a total of $13.8 million in distributions to investors.

|  | 12/31/2018 | 12/31/2019 | 6/30/2020 |
|---|---|---|---|
| Revenue | $0 | $0 | $0 |
| Expenses | $0 | $0 | $0 |
| Net Income | $0 | $0 | $0 |
|  |  |  |  |
| Members Contributions | $51,886,017 | $96,556,684 | $90,434,346 |
| Members Distributions | $1,213,288 | $5,969,318 | $6,607,926 |

NRIA's Consolidated Income Was Insufficient to Pay Distributions

43.     NRIA also did not have audited financial statements.   The same New Jersey certified public accounting firm reviewed NRIA's consolidated financial statements (which includes the results of the Fund).

44.     The consolidated financial statements reflect that for the period of inception through June 30, 2020, NRIA did not have sufficient net income to cover the distributions paid by the Fund.

|  | 12/31/2018 | 12/31/2019 | 6/30/2020 |
|---|---|---|---|
| Revenue | $14,913,243 | $24,807,986 | $41,851,724 |
| Net Income | $1,912,412 | $1,548,762 | $481,408 |

45.     As discussed in more detail below, the revenue and net income as reported in these financial statements (and summarized below) was grossly overstated and NRIA in fact, earned and collected almost no revenue during the period.

**NRIA Misrepresented Revenue, Income and Equity to Investors**

46.     The PPMs disclosed that the Fund intended to use the cash method of accounting; however, NRIA's consolidated financial statements disclosed that with the exception of revenue,

the financial statements were prepared in accordance with generally accepted accounting principles ("GAAP"), which requires accrual accounting. As noted above, only NRIA's consolidated financial statements – and not the Fund's financial statements – reflected any revenue earned. In fact, under both the cash method of accounting and GAAP (*i.e.*, accrual accounting), almost no revenue should have been recorded.

47.     Grabato, O'Brien and Salzano disseminated summary financial information to investors that was derived from NRIA's reviewed consolidated financial statements and which grossly inflated the Fund's financial condition.

48.     The independent auditor report and the footnotes to the financial statements disclosed that the revenue recorded was not earned, and therefore, not in compliance with GAAP.  In fact, had they complied with GAAP, almost none of the revenue would have been recorded.

49.     The financial summaries mailed to investors and available to them via a Dropbox link reported all the revenue recorded in the financial statements, but failed to disclose that the revenue recorded was not consistent with the cash method of accounting or GAAP.  Thus, investors were misled into thinking that NRIA was performing better financially than it was based on this misrepresentation.

50.     According to NRIA's consolidated financial statements, NRIA recorded revenue for development fees at the time the agreement was signed with the underlying operating company. These fees are to be paid by the end-purchaser of the property when the project is completed and sold. Thus, in accordance with GAAP, these fees cannot be recorded until the performance obligation is settled and the property is transferred to a buyer.

51.     In fact, none of the development fees that were recorded had been collected through at least June 14, 2020, and in 2019, NRIA had reversed $7 million of the receivables they booked in 2018.

52.     NRIA's independent accounting firm identified the practice of booking the development fees as revenue as a departure from GAAP in its independent accountants' review report, and the notes to the Consolidated Financial Statements for the years ended 2018 and 2019 and for the period ending June 30, 2020.

53.     Improperly recording the development fees as revenue had the effect of materially overstating net income for 2018 through June 2020 as follows:

|  | Originally Reported Net Income | Development Fee Improperly Recorded as Revenue | Corrected Net Income (Loss) | Percentage Overstatement of Net Income |
|---|---|---|---|---|
| 2018 | 1,912,412 | 11,130,000 | (9,217,588) | 582% |
| 2019 | 1,548,762 | 19,000,000 | (17,451,238) | 1227% |
| 6/30/2020 | 481,408 | 22,400,000 | (21,918,592) | 4653% |

54.     In response to questions from the independent accountants regarding the revenue recognition in November 2020, Salzano falsely stated in an email that recording the development fees as revenue "is aggressive under current GAAP standards but properly and fully disclosed as an exception to GAAP that we walk all investors and banks through."

55.     Salzano further stated, "[b]ottom line is if we don't reasonably and properly with disclosure book our fees the old fashioned way [*i.e.*, when they sign agreements to purchase properties], we don't show a profit and we look very bad during this growth phase."

56.     Salzano and O'Brien helped prepare, edit, and finalize information in the PPMs about the offering.  They and Grabato disseminated financial information with investors accompanied by a cover letter signed by Grabato.

57.     Salzano, O'Brien and Grabato knew or were reckless in not knowing that they were misleading investors with the financial information they disseminated. In internal emails during 2020 and 2021, Salzano and O'Brien conceded that the operation was not profitable, that they had to record development fees as revenue to show a profit, and that it was important that the Fund's financial statements show profits.

58.     For example, in June of 2020, Salzano told O'Brien in an email, "we need these fees to show profit during the development phase…can't be break even or loss on financials – just looks bad – bad optics."

59.     O'Brien complained to Salzano that they were "send[ing] out more and more tainted financial information," among other issues. But O'Brien, a twenty percent owner of the firm, neither corrected the misleading financials shared with investors, nor prevented NRIA from publishing information he knew or was reckless in not knowing was not an accurate portrayal of the Fund's operations.

**Other Misrepresentations, Omissions and Misuses of Investor Money**

60.     In addition to inflating financials and using investor funds to pay distributions, the Defendants knowingly or recklessly concealed other information and misuses of investors' money as follows:

a.      They failed to disclose that more than a million dollars investors
contributed to the Fund was being diverted to Salzano's current spouse,
Relief Defendant Budinska, who used the money for personal and luxury
expenses. Budinska did not work for NRIA and financial records reflect
her occupation as "baby sitter."

b.      They never disclosed prior civil and criminal fraud charges
involving NRIA's principals, or, relatedly, that they used investor funds
to alter internet search results to conceal prior regulatory actions
concerning Salzano and Scutaro – even as NRIA's advertisements
encouraged investors to conduct due diligence on its enterprise.

c.      To attract investors, Scutaro and the NRIA's sales team
told them that NRIA had $60 million of its own money invested in the
Fund, and it did not pay referral fees to gain new investors, both which
were untrue.

61.     The foregoing misstatements and omissions to investors regarding the
misappropriation of investor funds or the use of investor funds for purposes contrary to those
disclosed in the PPM were material.

<u>Investor Money Flowing to Defendants and Salzano's Family Members</u>

62.     Grabato was the sole signatory on NRIA's and the Fund's many bank accounts,
including the ones that received investor contributions and paid investor distributions.

63.     Investor money deposited into the Fund's main account was largely diverted to
other accounts controlled by each of the Defendants.  Some of this money was transferred to

Salzano and members of Salzano's family, including his current wife and ex-wife, Relief Defendants Budinska and Samul.

64.     Investor contributions to the Fund flowed to NRIA's executives personally (not as salary), as follows:

a.     Grabato received at least $4.2 million in investor funds into his personal and business LLC accounts;

b.     O'Brien received approximately $6.7 million in investor funds through NRIA Capital Partners, Inc. and 44 Capital Management Corp., entities he owned and controlled;

c.     Salzano received, directly and indirectly through Relief Defendant Budinska, at least $640,000 in investor funds;

d.     Scutaro received nearly $540,000 in investor funds in June 2021 above his usual weekly compensation at or around the time tax authorities inquired about unpaid taxes;

e.     Budinska received a total of nearly $1.5 million of investor funds, including $296,000 she received through Grabato's account and more than $1.2 million she received directly from NRIA and affiliated entities; and

f.     Samul received more than $260,000 of investor funds through transfers from Grabato.

65.     For example, from June 2020 through June 2021, nearly $1.25 million was sent from the NRIA account where Fund investments were deposited into Grabato's business LLC and personal accounts.  Grabato transferred $420,000 to Salzano's personal account, and other funds to Budinska (seven checks totaling $296,000) and Samul (nineteen checks totaling

$260,762, two of which were annotated "gift").  The funds that Budinska and Samul received from Grabato's accounts were ill-gotten gains because neither of them worked for NRIA or any affiliated entities in any capacity and neither had a legitimate claim to those funds.

66.     As to Relief Defendant Budinska, her personal checking account records show that she used the money received from NRIA (authorized by Grabato) for ATM cash withdrawals, for debit card purchases at various retailers, and for federal and state tax payments in the amount of $555,785.

67.     In addition, Budinska transferred a total of $220,000 to Salzano's business checking account after his arrest – writing "husband" on the memo line of her checks – from which he paid $219,000 in federal taxes apparently owed for the previous four years.

68.     From inception to June 14, 2021, the PPMs did not disclose that investor contributions to the Fund would be diverted and misused, instead of being invested in real estate projects and running the Fund.  Such omissions concerning the use of investor funds were material.

<u>Investor Money Spent on Reputation Management to Hide Defendant Salzano's Past</u>

*Defendant Salzano's History of Misconduct*

69.     Individuals involved in NRIA's management are described in the PPMs, but no mention is made of their prior roles in a $47 million fraud perpetrated by NorVergence, Inc. ("NorVergence"), a New Jersey-based telecommunications company founded by Salzano and a family member.

70.     In 2005, a federal court in New Jersey entered judgment in favor of the Federal Trade Commission ("FTC") and against NorVergence for defrauding consumers through misleading claims of dramatic savings on telephone, cellular and internet services.

71.     A year later, Salzano settled related fraud charges by agreeing to pay $50 million each (which was suspended due to inability to pay) and agreeing to make affirmative disclosures in the future when they sell or finance telecommunications services.

72.     After settling the NorVergence matter, Salzano became an executive at NRIA.

73.     Scutaro, who also had been a NorVergence executive, became head of NRIA's sales staff shortly after Salzano's settlement with the FTC.

74.     Once at NRIA, Salzano started calling himself Nicholas or Nick Salzano, and Scutaro changed the spelling of his last name from "Scuttaro" to Scutaro.

75.     Three years after settling with the FTC, Salzano was indicted by a Calcasieu Parish, Louisiana grand jury with three counts of money laundering, four counts of conspiracy to commit money laundering, and four counts of theft.  The charges all related to NorVergence.

76.     Salzano pled guilty in 2013 in Louisiana state court to five counts of theft, totaling nearly $48,000, relating to the NorVergence fraud. He paid restitution and served three years of supervised probation in New Jersey – even as the Defendants started soliciting and receiving investments on behalf of NRIA.

77.     NRIA did not disclose this information concerning NorVergence and Salzano's and Scutaro's involvement in its PPMs.  Rather, as discussed below, NRIA sought to conceal it by spending investor money on reputation management firms to alter online search results and divert investors' attention from Salzano's prior fraud.

78.     The omission in the PPMs about Salzano's prior involvement with fraudulent or criminal conduct was material.

*Reputation Management to Hide Defendant Salzano's Prior Misconduct*

79.     In its nationwide radio and television advertisements, NRIA encouraged investors and prospective investors to conduct due diligence on the firm and its executives.

80.     However, NRIA actively thwarted discovery of the NorVergence fraud, and Salzano's role in it, by using Fund investments to pay reputation management firms to suppress Salzano's background.

81.     For example, between May 2019 and February 2021, Grabato used money invested in the NRIA account where Fund investments were deposited to pay more than $344,000 to a technology firm based in India.

82.     The purpose of the payments was to create at least twenty-five decoy websites that would distract investors from accurate information about the NorVergence fraud if they searched terms relating to NorVergence or Thomas Salzano.

83.     "Now, when people in the US type the following search terms in Google search engine they find the positive asset created by us," the technology firm wrote in its report to NRIA. "These newly created pages have started appearing in search results and we are working hard to bring them in higher ranking. Our motive behind creation of these pages is to … suppress the negative links."

84.     Thus, even as NRIA's advertisements purported to encourage Fund investors to conduct due diligence, it used investor money to obstruct them from learning the truth about its executives' history of fraud.

<u>Scutaro Lied to Investors about NRIA's Investment and Referral Fees</u>

*NRIA Did Not Have "Skin in the Game"*

85.     To entice investors and give them confidence in the Fund, Scutaro and NRIA's sales staff told investors that NRIA had "skin in the game," specifically, that it invested $60 million of its own money in the Fund. This was untrue.

86.     In fact, NRIA did not invest any money at all in the Fund. In addition, Grabato and O'Brien, personally, invested a total of less than $2 million in NRIA – not in the Fund – including $1.17 million that Grabato invested prior to the Fund's inception, and $140,000 that O'Brien contributed to one of NRIA's accounts shortly after the Fund was established.

*NRIA Paid Referral Fees While Scutaro Told Investors It Did Not*

87.     Scutaro told investors, directly and through his sales staff, that NRIA did not pay referral fees or commissions to anyone soliciting new investments, and that in fact, "under [the] SEC regulations …[i]t's illegal to pay out finder's fees, commissions or to dilute the investor returns by keeping a portion of it as a fee."

88.     However, at least one marketing firm received more than $200,000 in referral fees from NRIA since 2020.  The proprietor said that Scutaro instructed her not to use the word "commission" to describe her payments, which like commissions were calculated on a percentage basis of money her client referrals invested, but instead to call them an "advertising fee."

89.     When the marketing firm proprietor submitted names of investors she referred to NRIA for payment of her fees, Scutaro told her to add names to the list to make it appear she was paid a lower per-investor referral fee. She did so, because Scutaro told her that was the only way

she was going to get paid. Salzano approved payment to her in the form Scutaro told her to submit.

### FIRST CLAIM FOR RELIEF
**Violation of Securities Act Sections 17(a) Against All Defendants**

90.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 89.

91.    By virtue of the foregoing, the Defendants, directly or indirectly, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly, recklessly, or negligently: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon a purchaser.

92.    By reason of the foregoing, the Defendants, directly or indirectly, have violated and, unless restrained and enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
**Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
Against All Defendants**

93.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 89.

94.    By virtue of the foregoing, the Defendants, directly or indirectly, in connection with the purchase or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly or recklessly

employed devices, schemes or artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operate or would operate as a fraud or deceit.

95.     By reason of the foregoing, the Defendants, directly or indirectly, have violated and, unless restrained and enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## THIRD CLAIM FOR RELIEF
### Unjust Enrichment Against All Relief Defendants

96.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 89.

97.     By virtue of the foregoing, in the manner described above, the Relief Defendants received investor funds and/or ill-gotten gains for which they gave no bona fide consideration and to which they have no legitimate claim.

98.     As described herein, the funds acquired by the Relief Defendants are traceable to the Defendants' wrongful acts and were acquired under circumstances in which it is not just, equitable or conscionable for Relief Defendants to retain the funds.

99.     By reason of the conduct described above, the Relief Defendants have been unjustly enriched and should be required to return their ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court grant the following relief:

### I.

Permanently restraining and enjoining the Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### II.

Ordering the Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### III.

Ordering the Defendants and Relief Defendants to disgorge or return ill-gotten gains or unjust enrichment obtained as a result of the violations alleged in the Complaint, and ordering them to pay prejudgment interest thereon, under Exchange Act Sections 21(d)(3), (5) and (7) [15 U.S.C. §§ 78u(d)(3), (5) and (7)];

### IV.

Permanently prohibiting Defendants Grabato, O'Brien, Salzano and Scutaro from serving as officers or directors of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78*l*] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

## V.

Granting any other and further relief this Court may deem just and proper.


### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

that this case be tried to a jury.


Dated:  New York, New York
         October 13, 2022

                                        */s/ Thomas P. Smith Jr.*
                                        _____
                                        THOMAS P. SMITH JR.*
                                        CO-ACTING REGIONAL DIRECTOR
                                        Richard Hong
                                        Alix Biel*
                                        Attorneys for Plaintiff
                                        SECURITIES AND EXCHANGE COMMISSION
                                        New York Regional Office
                                        100 Pearl Street, Suite 20-100
                                        New York, New York 10004-2616
                                        212-336-0956 (Hong)
                                        Email: HongR@sec.gov

                                 * Not admitted in District of New Jersey

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged against the

Defendants in the foregoing Complaint is related to *United States v. Thomas Nicholas Salzano,*

22-_____ (D.N.J.), pending in the United States District Court for the District of New

Jersey.

*/s/ Thomas P. Smith Jr.*

Dated: October 13, 2022          _____

THOMAS P. SMITH JR.
CO-ACTING REGIONAL DIRECTOR
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Rule 101.1(f), the undersigned hereby designates the United States Attorney's Office for the District of New Jersey to receive service of all notices or papers in this action at the following address:

> Andrew Ruymann
> Chief, Civil Division
> United States Attorney's Office
> District of New Jersey
> 970 Broad Street, Suite 700
> Newark, NJ 07102
> (973) 645-2700
> Email: John.Ruymann@usdoj.gov

SECURITIES AND EXCHANGE COMMISSION

*/s/ Thomas P. Smith Jr.*

Dated: October 13, 2022 _____

THOMAS P. SMITH JR.
CO-ACTING REGIONAL DIRECTOR
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616